UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EMPLOYEE PAINTERS' TRUST, et al., | CASE NO. C12-0101JLR |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT |
| v. | |
| CASCADE COATINGS, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Before the court is Plaintiffs'[1] third motion for default judgment against Defendant Mark Schlatter pursuant to Federal Rule of Civil Procedure 55(b)(2).  (3d Mot. (Dkt. # 73).)  The court has reviewed the motion, the balance of the record, and the

_____

[1] Plaintiffs include:  Employee Painters' Trust, Western Washington Painters Defined Contribution Pension Trust, District Counsel No. 5 Apprenticeship and Training Trust Fund, Western Washington Painters Labor Management Cooperation Trust, International Painters and Allied Trades Industry Pension Fund, and International Union of Painters and Allied Trades District Counsel No. 5 (collectively "Plaintiffs").

1  applicable law.  Being fully advised, the court GRANTS Plaintiffs' third motion for

2  default judgment.  Plaintiffs are to file a partial satisfaction of judgment based on the

3  prior settlements they have obtained with other Defendants within 10 days of the date of

4  this order.

## II.    BACKGROUND

### A.    Factual Background

7        This is an employee benefits contribution case governed by the Employee

8  Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  Plaintiffs

9  originally sued two "Cascade Coatings" entities:  (1) Defendant Cascade Coatings, a

10 partnership ("Cascade Partnership"), which is a partnership comprised of Defendants

11 Walter James McLaughlin and Mark Stephen Schlatter (*see* 2d Am. Compl. (Dkt. # 47) ¶

12 4), and (2) Defendant Cascade Coatings, Mr. Schlatter's sole proprietorship ("Cascade

13 Proprietorship") (collectively "Cascade Coatings").  (*See id.* ¶ 5.)

14       This dispute arises as a result of Cascade Coatings' involvement as a subcontractor

15 on the Seattle-Tacoma International Airport Modernization Project ("Airport

16 Modernization Project").  A Project Labor Agreement ("PLA") governs work done on the

17 Airport Modernization Project and requires contractors to adhere to collective bargaining

18 agreements.  (*See* 2d Mot. Read Decl. Ex. A (Dkt. # 71-2) at 9 (Art. II §§ 3(b), 4 of the

19 PLA).)  In order to work on any part of the Airport Modernization Project, a contractor

20 must sign a "Letter of Assent" agreeing to the terms and conditions of the PLA and

21 collective bargaining agreements.  (*Id.*)  The PLA and collective bargaining agreements

22 require contractors to submit written reports and pay fringe benefit contributions to trusts

ORDER- 2

that benefit local unionized construction workers.  (*See id.* at 26 (Art. X, § 3 of the PLA).)

On September 12, 2011, Mr. Schlatter executed a letter of assent agreeing to be bound by the terms of the PLA.  (*Id.* at 2.)  Subsequently, Cascade Coatings submitted two monthly reports to Plaintiff Employee Painters' Trust ("Painters' Trust") listing its employees who performed work covered by the PLA, the number of hours worked, and a calculation of remittances due to Plaintiffs under the PLA and related collective bargaining agreements.  (*See generally* 2d Mot. Read Decl. Ex. H.)  The September 2011 report indicates that employees of Cascade Coatings did not work any hours under the PLA that month.  (*Id.* at 2-3.)  The October 2011 report indicates that employees of Cascade Coatings worked 208.5 hours.  (*Id.* at 4.)  Cascade Coatings did not submit any subsequent reports or payments to Plaintiffs despite the fact that Cascade Coatings employees continued to work on the Airport Modernization Project.  (*See generally* 2d Am. Compl.)  Thereafter, Painters' Trust initiated this lawsuit because it believed that Cascade Coatings was in breach of its obligations to report employee hours and make contributions pursuant to the PLA, underlying collective bargaining agreements, and ERISA.  (*Id.*)

## B.    Procedural Background

On January 18, 2012, Painters' Trust filed suit against Mr. Schlatter, his business partner Mr. McLaughlin, and Cascade Partnership.  (Compl. (Dkt. # 1) ¶ 4.)  The complaint sought damages and injunctive relief for Defendants' failure to make employee benefit contributions.  (*See id.* ¶¶ 24-35.)  On June 27, 2012, Painters' Trust filed an

1  affidavit of proof of service, which attested to having served "Defendant Cascade

2  Coatings" with a copy of the summons and complaint on April 17, 2012.  (Aff. Of Serv.

3  (Dkt. # 8) at 1.)  Later, in the parties' joint status report filed on August 17, 2012,

4  Painters' Trust implied that it had served Mr. Schlatter by stating that "[o]nly Walter

5  James McLaughlin has not been served because he cannot be found."  (*See* JSR (Dkt. #

6  12) at 5.)

7          After the parties' joint status report, Plaintiffs amended their complaint twice.

8  (*See generally* Dkt.)  Initially, Painters' Trust amended its complaint on October 3, 2012.

9  (Am. Compl. (Dkt. # 17).)  The amended complaint named additional trust plaintiffs and

10  additional defendants, including Cascade Proprietorship, the Port of Seattle, and various

11  insurance companies.  (*See id.* ¶¶ 5, 13-15.)  The amended complaint asserted bond

12  claims against the new insurance company defendants and a common law unjust

13  enrichment claim against the Port of Seattle.  (*See id.* ¶¶ 53-65.)  Thereafter, Plaintiffs

14  amended their complaint a second time on July 3, 2013.  (See 2d Am. Compl.)  Neither

15  Mr. Schlatter, Cascade Proprietorship, nor Cascade Partnership has ever answered

16  Plaintiffs' complaints.  (*See* Dkt.)

17          Next, on August 27, 2013, Plaintiffs filed three motions for entry of default against

18  Mr. Schlatter, Cascade Proprietorship, and Cascade Partnership, separately.  (Dkt. ## 48-

19  50.)  The court denied these motions because Mr. Schlatter and Cascade Partnership were

20  not properly served with Plaintiffs' first or second amended complaints.  (9/30/13 Order

21  (Dkt. # 51) at 9-10.)  The court also ordered Plaintiffs to show cause why Cascade

22  Proprietorship should not be dismissed for being an improperly named party in the suit.

1  (*Id.*)  In response to the court's show cause order, Plaintiffs filed a notice of voluntary

2  dismissal as to Cascade Proprietorship.  (10/15/13 Not. (Dkt. # 53).)

3       Subsequently, on November 6, 2013, Plaintiffs filed a motion to dismiss many of

4  their bond claims under Federal Rule of Civil Procedure 41(a)(2).  (Mot. to Dismiss (Dkt.

5  # 61).)  The court granted this motion to dismiss on December 2, 2013.  (12/2/13 Ord.

6  (Dkt. # 67).)

7       On December 20, 2013, Plaintiffs filed their first motion for default judgment

8  against Mr. Schlatter.  (*See* Mot. (Dkt. # 68).)  The court denied Plaintiffs' motion for

9  several reasons.  (2/10/14 Order (Dkt. # 69).)  First, the *Frow* Rule prohibited the court

10  from entering default judgment against Mr. Schlatter.  (*Id.* at 7.)  Under *Frow*, "when one

11  of several [jointly-liable] defendants . . . defaults, judgment should not be entered against

12  that defendant until the matter has been adjudicated with regard to all defendants, or all

13  defendants have defaulted."  10A Charles Alan Wright & Arthur R. Miller, *Federal*

14  *Practice and Procedure* § 2690 (3d ed. 2013) (*citing Frow v. De La Vega*, 82 U.S. 552,

15  554 (1872)).  At the time of their motion, Plaintiffs had not properly dismissed Cascade

16  Partnership or Mr. McLaughlin.  (2/10/14 Order at 10.)  Accordingly, the court could not

17  enter default judgment against Mr. Schlatter until the court either entered default against,

18  or Plaintiffs properly dismissed, Cascade Partnership and Mr. McLaughlin.  Second, the

19  court determined that the *Eitel* factors weighed against granting default judgment.  (*See*

20  *id.*)  Finally, the court noted that Plaintiffs had not properly substantiated their damages

21  as required by the Federal Rules of Civil Procedure and the court's Local Rules.  (*Id.* at

22  18.)  Specifically, Plaintiffs did not (1) demonstrate that they were legally entitled to the

1  amount requested, and (2) did not provide the court with a concise explanation of how the

2  amounts were calculated.  (*Id.* at 19.)

3       After the court denied Plaintiffs' first motion for default judgment, on April 10,

4  2014, Plaintiffs provided the court with notice that they were voluntarily dismissing

5  Cascade Partnership and Walter McLaughlin pursuant to Federal Rule of Civil Procedure

6  41(a)(1)(A)(i).  (Not. (Dkt. # 70).)  That same day, Plaintiffs filed their second motion for

7  default judgment.  (2d Mot. (Dkt. # 71).)  With this motion, Plaintiffs filed additional

8  evidence supporting their claim against Mr. Schlatter and the amount of damages

9  requested.  (*See generally* Read Decl. (Dkt. # 71-1); Urban Decl. (Dkt. # 71-5); Walker

10  Decl. (Dkt. # 71-3).)

11       The court denied the Plaintiffs' second motion for default judgment.  (5/12/14

12  Order (Dkt. # 72).)  In its order, the court noted that Plaintiffs had cured some of the

13  deficiencies the court had identified in the first motion for default judgment.  (*Id.* at 8-9.)

14  Plaintiffs had submitted sufficient evidence to substantiate a prima facie case against Mr.

15  Schlatter; had provided the court with evidence of the appropriate rates for calculating

16  interest and liquidated damages; and had attached sufficient justification to demonstrate

17  that Plaintiffs' request for attorneys' fees was limited to hours worked on claims covered

18  by the PLA.  (*Id.*)  However, the court found many errors and discrepancies among the

19  three sources that Plaintiffs supplied to determine the total hours worked on the Airport

20  Modernization Project by Defendant's employees.  (*Id.* at 9-11.)  These discrepancies left

21  the court unable to verify the reasonableness of Plaintiffs' damage calculations.  (*Id.*)

22

ORDER- 6

1    On June 2, 2014, Plaintiffs submitted a third motion for default judgment, as a

2    supplemental brief to their second motion.[2]   (3d Mot. (Dkt. # 73).)  In their motion,

3    Plaintiffs clarify the supporting documentation they have used to calculate the total

4    number of hours worked by Defendant's employees on the Airport Modernization

5    Project.  (*Id.* at 3-5.)  Also, Plaintiffs supply calculations to substantiate damages should

6    the court rely upon Defendant's certified payroll as a determination of employee hours,

7    rather than an audit conducted by the Washington Department of Labor and Industries

8    ("L&I").  (*Id.* at 7-8; 3d Mot. Ex. B.)  Plaintiffs' third motion for default judgment is now

9    before the court.

10                           **III.    ANALYSIS**

11    **A.    Applicable Legal Standards for Default Judgment**

12    Entry of default judgment is left to the court's sound discretion. *Aldabe v. Aldabe*,

13    616 F.2d 1089, 1092 (9th Cir. 1980).  A defendant's default does not automatically entitle

14    a plaintiff to a court-ordered judgment because granting or denying relief is within the

15    court's discretion.   *Id.* at 1092.  In exercising its discretion, the court considers seven

16    factors (the "*Eitel* factors"):  (1) the possibility of prejudice to the plaintiff if relief is

17    denied; (2) the substantive merits of the plaintiff's claims; (3) the sufficiency of the

18    claims raised in the complaint; (4) the sum of money at stake in relationship to the

19    defendant's behavior; (5) the possibility of a dispute concerning material facts; (6)

20    whether default was due to excusable neglect; and (7) the preference for decisions on the

21    _____

22    [2] Plaintiffs' third motion incorporates their second motion for default judgment in full. (3d Mot. at 2.)

1  merits when reasonably possible.  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir.

2  1986).

3       "If the court determines that the allegations in the complaint are sufficient to

4  establish liability, it must then determine the amount and character of the relief that

5  should be awarded."  *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1078

6  (C.D. Cal. 2012) (internal quotations and citations omitted).  This is because at the

7  default judgment stage, well-pleaded factual allegations relating to damages are not taken

8  as true.  *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir.1977); *TeleVideo Sys.,*

9  *Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  Thus, the plaintiff must "prove-

10  up" his damages, and the damages sought must not be different in kind or amount from

11  those set forth in the complaint.  *Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp.

12  2d 1049, 1053-54 (C.D. Cal. 2011).  The court's role is to ensure that the amount of

13  damages is reasonable and is demonstrated by the plaintiff's evidence.  *See* Fed. R. Civ.

14  P. 55(b); *LG Elecs., Inc. v. Advance Creative Computer Corp.*, 212 F. Supp. 2d 1171,

15  1178 (N.D. Cal. 2002) ("[T]he evident policy of [Rule 55(b)] is that even a defaulting

16  party is entitled to have its opponent produce some evidence to support an award of

17  damages.").

18    **B.    The *Eitel* Factors Weigh in Favor of Granting Default Judgment**

19       In its order denying Plaintiffs' first motion for default judgment, the court found

20  that the *Eitel* factors weighed against granting a default judgment.  (2/10/14 Order at 10-

21  11.)  Plaintiffs' failure at that time to establish a prima facie case against the Defendant

22  had led the court to conclude the second, third, and fifth factors weighed against granting

1  default judgment.  (*Id.* at 11-12.)  Also, the absence of a prima facie case led the court to

2  find that the fourth factor weighed against granting default judgment, because the

3  potential for material factual disputes rendered such a large award unreasonable.  (*Id.* at

4  15.)  The seventh factor weighed against default judgment as well.  (*Id.*)  Although the

5  first and sixth factors were found to weigh in favor of default judgment, on balance, the

6  *Eitel* factors did not support a default judgment.  (*Id.* at 16-18.)

7       Since then, Plaintiffs have established a prima facie case.  In its order denying

8  Plaintiffs' second motion for default judgment, the court noted that Plaintiffs had

9  established a prima facie case against Mr. Schlatter through the submission of additional

10  evidence.  (5/12/14 Order at 9.)  The court noted documentation showing that Mr.

11  Schlatter agreed to be bound by the PLA's terms; that Cascade Coatings performed work

12  on the Port of Seattle Bus Maintenance Facility, which is governed by the PLA; and that

13  Mr. Schlatter only reported two months of that work.  (*Id.*; *see also* Read Decl. Ex. A at

14  2; Walker Decl. Ex. A; Read Decl. Ex. H).[3]

15       As a result, the court finds that second, third, fourth, and fifth *Eitel* factors now

16  weigh in Plaintiffs' favor.  The second and third *Eitel* factors are often considered

17  together and require that Plaintiffs establish a prima facie case.  *Danning v. Lavine*, 572

18

19     [3] Article II, § 4 of the Port of Seattle Project Labor Agreement applies the provisions of collective bargaining agreements to work on the project. (Read Decl. Ex. A. ("The provisions of

20  this Project Labor Agreement (including the Schedule A's, which are the local Collective Bargaining Agreements, as modified by this Agreement, between bona fide contractor groups or representatives and the signatory Unions having covered work that corresponds to Qualifying

21  Work on the Project) shall apply to the work covered by this Agreement.").)  Mr. Schlatter signed a Letter of Assent pursuant to the Project Labor Agreement on September 12, 2011. (*Id.*

22  at 2.)

1   F.2d 1386, 1388 (9th Cir. 1978).  Plaintiffs have established a prima facie case.

2   Moreover, there is no possibility of a dispute as to material facts demonstrating Mr.

3   Schlatter's delinquency on contributions required under the PLA.  Mr. Schlatter reported,

4   and submitted contributions for only 208.5 hours (*see* 2d Mot. Read Decl. Ex. H at 4),

5   when his own certified payroll reports show his employees worked 1,000 hours in excess

6   of that amount (*see* 2d Mot. Walker Decl. Ex. A).

7           Therefore, on balance, the *Eitel* factors support a finding of default judgment

8   against the Defendant.  As before, the first and sixth factors weigh in Plaintiffs' favor.

9   (*See* 2/10/14 Order at 16-17.)  After Plaintiffs' showing of a prima facie case, the second,

10  third, fourth, and fifth factors now weigh in Plaintiffs' favor as well.  Only the seventh

11  factor weighs against.

12       **C.    Damages Calculation**

13          i.       Hours Worked by Defendant's Employees

14          Plaintiffs submit three sources, each of which indicates a different number of

15  hours worked by Mr. Schlatter's employees on the Airport Modernization Project after

16  Mr. Schlatter signed the Letter of Assent.  First, Mr. Schlatter's certified payroll records

17  indicate his employees worked 1,214 hours on the project.  (2d Mot. Walker Decl. Ex.

18  A.)  Second, an audit conducted by Lindquist LLP at Plaintiff's request indicates 2,148.5

19  hours.  (2d Mot. Walker Decl. Ex. D at 5-6.)  Third, an audit conducted by the

20

21

22

1  Washington Department of Labor and Industries ("L&I") finds a total of 2,188.5 hours[4]

2  worked by Defendant's employees.  (2d Mot. Walker Decl. Ex. B.)  Having reviewed all

3  three, the court determines that the Labor and Industries audit to be the most accurate

4  determination of hours worked by Mr. Schlatter's employees.

5      The court cannot rely upon the Lindquist audit due to multiple errors in that audit.

6  A Lindquist employee admits errors in the audit's calculation of hours.  (2d Mot. Walker

7  Decl. ¶ 21.)  Plaintiffs' counsel believes there are additional errors beyond those noted by

8  the Lindquist employee.  (2d Mot. Urban Mot. Decl. ¶ 10.)  In addition, reliance on the

9  Lindquist audit is not necessary because the audit does not present an independent factual

10  determination of hours.  (2d Mot. Walker Decl. Ex. D at 3.)  Instead, the Lindquist audit

11  relies on the findings of the L&I audit and the certified payroll reports.  (*Id.*)

12      In weighing the remaining two sources, the court finds that the L&I audit, rather

13  than Mr. Schlatter's certified payrolls, is the most accurate source of hours in the record.

14  First, Mr. Schlatter's certified payrolls are internally inconsistent.  (*See* 2d Mot. Walker

15  Decl. Ex. A.)  Mr. Schlatter had certified that no work was performed by his employees

16  on the project from February 26 to March 3, 2012.  (*Id.* at 2)  However, Mr. Schlatter also

17  submitted a certified payroll report that indicated two employees worked eight-hour days

18  on the project from February 27 to March 2, 2012.  (*Id.* at 7.)  This internal inconsistency

19  undermines the reliability of Mr. Schlatter's certified payrolls.  Second, the L&I audit

20  _____

21     [4] The audit's spreadsheet indicates a Total Time of 2,129.5 hours on the top of the sheet. (2d Mot. Walker Decl. Ex. B at 5-6.)  However, this sum does not include fifty-one (51) hours

22  listed under column "TOTAL 1.5 HOURS" and eight (8) hours listed under column "TOTAL 2X HOURS."  (*Id.*)

ORDER- 11

1   conducted a comprehensive review of numerous payroll documents.  Its review included

2   an examination of "payroll records, daily time sheets, witness statements, various

3   documentation provided by workers and associated court cases, along with applicable

4   regulations." (2d Mot. Walker Decl. Ex. B.)  Third, the L&I audit took into account the

5   certified payroll records. (*Id.* at 3.)  After reviewing "the employees' time records logs,

6   [and the] daily records [Mr. Schlatter] provided," the Department "crosschecked [those

7   sources] against the [Defendant's] certified payroll records." (*Id.*)  Fourth, the L&I audit

8   found that inaccuracies in Mr. Schlatter's record-keeping practices are not confined to the

9   inconsistency noted above.  The L&I audit notes that Mr. Schlatter's "lack of accurate

10  records impeded" initial attempts to determine hours worked by his employees. (*Id.*)

11         Relying upon the L&I audit, the court determines Mr. Schlatter did not pay

12  required contributions on 1,980 hours.  The 1,980 hours are the difference between the

13  L&I audit's determination of 2,188.5 hours worked by Defendant's employees (*id.* at 5-

14  6), and the 208.5 hours reported by Mr. Schlatter on his October 2011 monthly

15  contribution report (2d Mot. Read Decl. Ex. H at 4).[5]

16         ii.       Contributions and Dues

17         Plaintiffs request that the calculation of damages for delinquent payments by Mr.

18  Schlatter include employer contributions and employee union dues. (See 3d Mot. Ex. A,

19  3; 3d Mot. Ex. B, 3.)  The court finds that the Defendant is delinquent on employer

20

21         _____

       [5] The October 2011 monthly contribution report is the only report submitted by Mr.
22  Schlatter to Plaintiffs which indicates his employees worked on the Airport Modernization
       Project. (*Id.*)

1  contributions.  Also, the court finds that an award of employee union dues is appropriate

2  as to the four employees listed in the October 2011 Monthly Contribution Report filed by

3  the Defendant.  (*See* 2d Mot. Read Decl. Ex. H at 4.)  However, an award of damages for

4  union dues is not appropriate as to the remaining employees identified in the L&I audit.

5         Employer contributions are mandatory under the PLA and associated collective

6  bargaining agreements.  The PLA requires Mr. Schlatter to "make fringe fund

7  contributions in the amounts . . . contained in the local collective bargaining agreements

8  that serve as the basis for Schedule A" in the Western Washington collective bargaining

9  agreement.  (2d Mot. Read Decl. Ex. A at 26 (Art. X, § 3).)  In addition, ERISA requires

10 Mr. Schlatter to fulfill his obligations "to make contributions to a multiemployer plan . . .

11 under the terms of a collectively bargained agreement."  29 U.S.C. § 1145.  The Western

12 Washington collective bargaining agreement establishes the required contributions in

13 Schedule A.  (2d Mot. Read Decl. Ex. B at 22 (Art. 17.8).)  Later updates to Schedule A

14 require higher rates of employer contributions.  (2d Mot. Walker Decl. Ex. C at 3-10.)

15        The court finds that an award of employer contributions is appropriate.  The PLA

16 required Mr. Schlatter to make contributions per employee hour worked on the Airport

17 Modernization Project according to Schedule A.  (2d Mot. Read Decl. Ex. A.)  The

18 employer contribution reports (2d Mot. Read Decl. Ex. H), and the L&I audit (2d Mot.

19 Walker Decl. Ex. B), indicate that these payments have not been made for the hours

20 employees worked.  The required payments are listed in Exhibit C to the Walker

21 Declaration and correspond to the fringe benefit funds described in the collective

22

1    bargaining agreement.  (2d Mot. Read Decl. Ex. B at 26-27 (Articles 20.2, 20.3, 20.4,

2    20.5, and 20.6.1).)[6]

3         However, the PLA and collective bargaining agreement authorize deduction of

4    union dues from an employee's pay only upon voluntary authorization of the employee.

5    Courts have enforced the payment of union dues by employers when the collective

6    bargaining agreement or trust agreements obligated the employer to do so.  *E.g., Emp.*

7    *Painters' Trust v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996) (per curiam)

8    (executive of signatory business held to personal liability for union dues as required in

9    trust agreements).  However, the PLA assented to by Mr. Schlatter does not require that

10   workers be members of a union.  (2d Mot. Read Decl. Ex. A at 13 (Art. IV, § 7).)  The

11   PLA does require agreement by the employer to "deduct union dues or representation

12   fees," but only from "any employee who executes a voluntary authorization for such

13   deductions."  (*Id.*)[7]  The collective bargaining agreement also requires employers to

14   _____

15        [6] Effective July 2011, Schedule A requires the following contributions by Mr. Schlatter
16   for each employee hour worked: a $5.16 health and welfare payment, $1.20 IUPAT Pension
     payment, $1.37 WW Pension payment, $0.46 Training Fund payment, $0.05 Painter Progression
17   payment, $0.05 WWSPE payment, and a $0.06 LMCI payment.  (2d Mot. Walker Decl. Ex. C at
     3-4.)  Effective January 2012, the IUPAT Pension payment increased to $1.62 per hour.  (*Id.* at
18   5.)  Effective March 2012, the WW Pension payment increased to $2.20 per hour and the LMCI
     payment increased to $0.07 per hour.  (*Id.* at 6.)  Plaintiffs did not request the IUPAT Pension
19   Deduction or the Health and Welfare Deduction (3d Mot. Ex. A.), so the court does not consider
     them.

20        [7] The PLA also requires all employees "to comply with the union security provision of
     the applicable Schedule A."  (2d Mot. Read Decl. Ex. A at 13 (Art. IV, § 7).)  The court cannot
21   locate this provision in Schedule A or in the portion of the collective bargaining agreement that
     Plaintiffs have submitted.  (*See* 2d Mot. Read Decl. Ex. B.)  In any event, the collective
22   bargaining agreement has a similar requirement that employers deduct union dues only upon
     voluntary authorization by the employee. (2d Mot. Read Decl. Ex. B at 28 (Art. 20.7).)

1    "agree to administrative dues, commonly known as dues check-off," but limits the

2    requirement to "apply only as to Employees who have voluntarily signed a valid dues

3    deduction authorization card."  (2d Mot. Read Decl. Ex. B at 28 (Art. 20.7).)  Although

4    later updates to Schedule A include union dues deductions, there is nothing contained in

5    the updates to indicate the voluntary authorization requirement no longer applied.  (*See*

6    2d Mot. Walker Decl. Ex. C at 3-10.)

7           The court finds adequate evidence to indicate that the four employees listed on the

8    October 11 report authorized deductions from their pay for union dues.  Mr. Schlatter

9    previously deducted dues from October 2011 payments to four employees—Richard

10   Eckland, Darren Ereth, Michael Ewing, and Fredrick Swanson.[8]  (2d Mot. Read Decl. Ex.

11   H at 4.)

12          Nonetheless, Plaintiffs have not produced evidence that the remaining employees

13   authorized deduction for union dues.  While Plaintiffs include labor organizations (s*ee* 2d

14   Amend. Compl. (Dkt. # 47) at ¶ 3), the court cannot find any indication that the

15   remaining employees—Johnnie Cooley, Maurico Ibarra, Stuart King, Mario Welch, or

16   the "John Doe" employee or employees[9]—had authorized deductions for dues.

17   Understandably, Plaintiffs cannot demonstrate that the unknown "John Doe" employee or

18   employees identified in the L&I audit authorized union dues deductions.  But Plaintiffs'

19   _____

20          [8] Schedule A has listed deductions from employee pay for union dues to be 3.3% of gross
     wages.  (2d Mot. Walker Decl. Ex. C.)

21          [9] The L&I audit noted that the "John Doe" employee may be a single or multiple
22   employees because the audit was not able to ascertain exactly who had worked those hours.  (2d
     Walker Decl. Ex. B.)

1  failure to demonstrate employee authorization generally leaves the court unable to

2  presume authorization by the unidentified employees.

3     Therefore, the court awards the Plaintiffs $19,178.66 in damages stemming from

4  Mr. Schlatter's failure to make required employer contributions.  This amount is

5  calculated by subtracting the dues of the employees whom the court cannot find had

6  authorized union dues deductions ($583.53) from the amount identified as delinquent

7  payments in Exhibit A to the third motion for default judgment ($19,717.19).  (*See* 3d

8  Mot. Ex. A at 2.)  Plaintiffs had calculated total delinquent payments by multiplying the

9  1,980 hours found in the L&I audit by the rates in Schedule A, as updated.  (*Id.* at 3; *see*

10 *also*, 2d Mot. Walker Ex. C.)

11    iii.   <u>Interest Rates and Award of Double Interest</u>

12    Plaintiffs also request double interest under 29 U.S.C. § 1132(g)(2)(B) and

13 § 1132(g)(2)(C)(i).  (3d Mot. at 7; 3d Mot. Ex. A at 7.)  ERISA states in relevant part,

14 "the court shall award the plan . . . (B) interest on unpaid contributions, [and] (C) an

15 amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated

16 damages provided for under the plan in an amount not in excess of 20 percent (or such

17 higher percentage as may be permitted under Federal or State law) of the [unpaid

18 employer contributions] . . . ."  29 U.S.C. §§ 1132(g)(2)(B)-(C).  The statute awards both

19 interest and liquidated damages to parties who obtain judgments in favor of trusts.  *See*

20 *Plumbers & Pipefitters Nat'l Pension Fund v. Eldridge*, No. 05-35623, 2007 U.S. App.

21 LEXIS 12055, at *3 (9th Cir. May 16, 2007).  Prejudgment interest is appropriate as a

22

1    form of compensatory relief, but not as a means of punitive damages.  *Dishman v. Unum*

2    *Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001).

3           The various trust agreements require that employers who are delinquent on their

4    payment furnish interest at a rate described in the trust agreements.  All of the trusts

5    except the International Painters and Allied Trades Industry Pension Fund set the interest

6    rate at twelve percent (12%) of the delinquent contribution from the due date until the

7    date paid or until the date of a judgment.  (2d Mot. Read Decl. ¶ 26; Ex. D at 29 (Art.

8    VIII ¶  4); Ex. E at 11 (Art. VIII ¶ 4); Ex. F at 11 (Art. VIII ¶  4).)  The International

9    Painters and Allied Trades Industry Pension Fund trust agreement requires the interest

10   rate authorized under 26 U.S.C. § 6626, which was 3% during the period in question.  (2d

11   Mot. Read Decl. Ex. G at 32; Read Decl. ¶ 26(e).)

12          The court finds that the interest rates are not a penalty, but are an appropriate

13   compensatory protection agreed upon under the PLA, collective bargaining agreements,

14   and the applicable trust agreements.  Appropriate interest is $4,314.00, which is the

15   interest that had accrued as of the date of filing, $4,203.41, with an additional daily

16   accrual of interest at $5.027 since filing on June 2, 2014.  (3d Mot. Ex. A at 7.)  Under 29

17   U.S.C. § 1132(g)(2)(C)(i), the court grants an additional $4,314.00.

18          iv.     Attorneys' Fees and Costs

19          Plaintiffs request $42,273.88 in attorneys' fees.  (3d Mot. at 8.)  This is the same

20   amount Plaintiffs had requested in their second motion for default judgment.  (2d Mot. at

21   19).  The court's previous order accepted the attached documentation as sufficient to

22   indicate that the attorneys' fees included only hours worked on claims covered by the

1    PLA.  (5/12/14 Order at 9.)  Because the third motion does not change the amount and

2    because sufficient evidence was included with the second motion to substantiate

3    attorneys' costs in this amount, the court grants an award of $42,273.88 in attorneys'

4    fees.

5         Plaintiffs have charged rates of under $200 per hour for legal work.  (2d Mot.

6    Urban Decl; James Decl.)  These are reasonable rates for ERISA claims. *See, e.g., Oster*

7    *v. Std. Ins. Co.*, 768 F. Supp. 2d 1026, 1035 (N.D. Cal. 2011) (approving hourly rate of

8    $400 for associates and $150 for paralegals); *Langston v. N. Am. Asset Dev. Corp. Group*

9    *Disability*, No. 08–2560 SI, 2010 WL 1460201, at *2 (N.D. Cal. Apr. 12, 2010)

10   (approving hourly rate of $550 for partner and $150 for paralegals); *Caplan v. CNA Fin.*

11   *Corp.*, 573 F. Supp. 2d 1244, 1249 (N.D. Cal. 2008) (approving hourly rates of $350 and

12   $330 for associates).  Having reviewed Plaintiffs' billing records, the court finds that the

13   hours expended on this case are reasonable.

14        Moreover, Federal Rule of Civil Procedure 54(d)(1) grants district courts the

15   discretion to award costs to prevailing parties.  Fed. R. Civ. P. 54(d)(1); *Marx v. General*

16   *Revenue Corp.*, 133 S. Ct. 1166, 1172 (2013).  Plaintiffs have incurred $2,227.88 in

17   reasonable costs in the action to date.  (2d Mot. Urban Decl.; James Decl.)  The court

18   therefore grants Plaintiffs $2,227.88 in costs.

19        v.    Audit Costs

20        Plaintiffs request reimbursement of $1,403.00 for the cost of an audit of

21   Defendant's payroll.  (3d Mot. at 8; 2d Mot. Read Decl. ¶ 28.)  The audit, conducted by

22   Lindquist LLP, indicated that the Defendant was delinquent in payments due according to

ORDER- 18

1    the trust agreements.  (2d Mot. Walker Decl. Ex. D.)  Therefore, recovery of the costs of

2    the audit is appropriate.

3         Plaintiffs' trust agreements authorize the trusts to audit Defendant's records and,

4    in the event the audit finds a delinquency, to recover the costs of the audit.  The

5    Employee Painters' Trust Agreement grants the trust authority to "audit the payroll

6    records . . . of an Employer, as [the Trustees] may deem necessary in the administration

7    of the Trust."  (Read Decl. Ex. C, Art. VIII, § 3).  If the audit determines "that an

8    Employer is delinquent," then the "Employer shall be obligated for the cost of the audit."

9    (*Id.*)[10]

10        The cost of an audit that uncovers delinquencies is also recoverable under

11   29 U.S.C. § 1132(g)(2) of ERISA, which concerns recovery actions for delinquent

12   payments to multiemployer plans in violation of 29 U.S.C. § 1145.  29 U.S.C. §

13   1132(g)(2); 29 U.S.C. § 1145.  A court may allow audit costs under 29 U.S.C.

14   § 1132(g)(2)(D) as a portion of "reasonable . . . costs of the action" where plaintiffs

15   demonstrate the audit was integral to the commencement of a suit.  Audit costs are also

16   allowable, within a court's discretion, under 29 U.S.C. § 1132(g)(2)(E) "[b]ecause an

17   award of audit costs to the prevailing party is consistent with the policy of encouraging

18

19   ──────────────

20        [10] The Western Washington Painters Defined Contribution Pension Plan, District Council
     No. 5 Apprenticeship and Training Trust Agreement, and Western Washington Painters Labor

21   Management Cooperation Trust Agreement contain identical language. (Read Decl. Ex. D (Art.
     VIII, § 3); Read Decl. Ex. E (Art. VIII, § 3), Read Decl. Ex. F (Art. VIII, § 3).)  The

22   International Painters Allied Trade Industry Pension Fund Trust Agreement has language to the
     same effect.  (Read Decl. Ex. G (Art. VI, § 6).)

1   full and fair contributions" by employers.  *Operating Eng'rs Pension Trust v. A-C Co.*,

2   859 F.2d 1336, 1343 (9th  Cir. 1988).

3         Lindquist's audit found that Defendant was delinquent.  (2d Mot. Walker Decl.

4   Ex. D at 2.)  The audit's findings as to the level of the delinquency were later noted to be

5   erroneous.  (*See* 5/12/2014 Order at 11; Walker Decl. ¶ 21; Urban Decl. ¶ 10).  But the

6   broad finding of a delinquency is supported by Defendant's certified payroll and by the

7   L&I audit.  (2d Mot. Walker Decl. Ex. B; 2d Mot. Walker Decl. Ex. C.)  The delinquency

8   in payment by Defendant is not due to the audit's errors in calculation.  Rather, when the

9   errors are corrected, it is clear that the Defendant was delinquent.  Therefore, recovery of

10  the audit costs is appropriate.

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

ORDER- 20

# IV.   CONCLUSION

For the foregoing reasons, the court GRANTS the third motion for default judgment (Dkt. # 73), and awards delinquent payment damages of $19,178.66, double prejudgment interest of $8,628.00, attorneys' fees of $42,273.88, attorneys' costs of $2,227.88, and audit costs of $1,403.00, totaling $73,671.22.  Plaintiffs are to file a partial satisfaction of judgment within 10 days of the date of this order.[11]

Dated this 25th day of June, 2014.

JAMES L. ROBART
United States District Judge

---

[11] According to Plaintiffs, "much of the full claim has been resolved by settlement against the other defendants in this litigation."  (1st Mot. (Dkt. # 68) at 12.)  Plaintiffs negotiated a settlement with other Defendants, no longer parties to this action, to recover $45,000.  (1st Mot. Read Decl. ¶ 34.)  The amounts requested by Plaintiffs in default judgment have not been offset by the settlement.  (*Id.*)  Plaintiffs commit that, upon issuance of this order granting default judgment, they will file "an appropriate partial satisfaction of judgment document with the court."  (1st Mot. at 12 n.2.)  Therefore, the court orders Plaintiffs to file a partial satisfaction of judgment with the court within 10 days of the date of this order.  The filing should indicate at least $45,000 in partial satisfaction of this judgment.